IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GLOBAL RECYCLING, SA, a Haitian corporation;<br><br>                Plaintiff;<br>v.<br><br>MONTCLAIR TECHNOLOGY, LLC, a Utah limited liability company; MICHAEL WILLIAMS, an individual; and DOES I–X;<br><br>                Defendants. | **ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:16-CV-1038<br><br>District Judge Jill N. Parrish |

Before the court is Plaintiff's Motion for Partial Summary Judgment (ECF No. 34), filed on September 15, 2017. The court heard oral argument on December 7, 2017. Having considered the parties' briefs, the arguments of counsel, and the relevant law, the court hereby grants Plaintiff's motion in part and denies it in part.

## I.    FACTUAL BACKGROUND

Global Recycling is a Haitian corporation managed by Cyrille Turnier and Peter de Gier. In the summer of 2014, Global contacted Michael Williams, the sole member of Montclair Technology (a Utah LLC). Global expressed a desire desire to build a motor oil refinery in Haiti. On July 11, 2014, the parties entered into a Non-Circumvention, Non-Disclosure and Working Agreement pertaining to the venture. And on August 31, 2014, the parties entered into a Purchase Order Agreement (the "Agreement").

The Agreement lies at the heart of this action. It is a sparse, four-page document under which Montclair agreed to "build and deliver to Global Recycling SA at its Spanish Fork, Utah, USA facility, a working R&D prototype of a continuous batch operating test unit capable of

processing a minimum of 15 gallons of a finished diesel product per hour, converted from Used Lubricating Oil (Test Unit)." Agreement ¶ 1. The Test Unit would be "a turnkey project, consisting of equipment to operate the unit in a continuous mode of operation." *Id.* ¶ 4B.

The Agreement describes the process by which the Test Unit will accomplish its design: "The process uses elements of sub and supercritical pressures through a high pressure reactor followed by vacuum distillation. This process is known as 'Hydrothermal Upgrading' using proprietary know how [sic], equipment, and methods developed by Montclair and is confidential and personal to Global Recycling SA." *Id.* ¶ 2. The same paragraph indicates that "[t]he Test Unit process and operating parameters used in the Test Unit will be demonstrated upon the delivery and demonstration of Test Unit as set forth in paragraph 4 hereof." *Id.*

Under the Agreement, the parties agreed to a purchase price of "$60,000 U.S. dollars for a completely mechanically skidded fully operational Test Unit." *Id.* ¶ 3. That price was to be paid in three installments: $30,000 on or before September 1, 2014; $25,000 on or before September 10, 2014; and $5,000 payable "upon delivery, inspection, acceptance and B/L of shipment to Haiti by Global Recycling SA of the Test Unit at Montclair's Spanish Fork, Utah facility." *Id.* Notably, Montclair guaranteed the price and operation of the Test Unit. *Id.* ¶ 4A. And Williams personally guaranteed the final construction costs of the Test Unit, promising that if the Test Unit cost more than $60,000, he would "as an individual, apart from his ownership in Montclair Technology LLC, . . . make up the difference to insure Global will take ownership of the finished unit free and clear of any financial encumbrances." *Id.*

Once Montclair produced the Test Unit, it was required to "notify Global Recycling SA that it can come to Montclair's facility to see a demonstration of the Test Unit operation and process." *Id.* ¶ 4. The paragraph continues: "In connection with the Test Unit operation,

Montclair will deliver written information and process descriptions of the Unit operation, controls, temperatures, and chemicals needed for Global Recycling SA to operate the Test Unit in Haiti." *Id.*

While the Agreement specifies dates for payment, it does not set a hard-and-fast deadline by which Montclair was to deliver the Test Unit. The only indication regarding timing is Montclair's commitment to "use its best efforts to complete the test unit within 45 days of receipt of the partial purchase price set forth in paragraph 3 hereof." *Id.* ¶ 4. Forty-five days after the second installment of the purchase price was October 18, 2014.

Finally, the Agreement addresses the issue of ownership: "The unit is paid for by Global Recycling SA and upon final payment shall be the sole property of Global Recycling SA. Montclair will not use the unit for its own purposes or to demonstrate its processes using the Global test unit to unaffiliated parties." *Id.* ¶ 6.

To date, Global has paid Montclair $87,600. But Global has not received the Test Unit from Montclair.

## II. PROCEDURAL BACKGROUND

On October 6, 2016, Plaintiff filed a complaint against Defendants. The complaint alleges six claims for relief: (1) breach of contract, (2) breach of express warranty, (3) violation of the Defend Trade Secrets Act, (4) misappropriation of trade secrets under the Utah Uniform Trade Secrets Act, (5) fraudulent inducement, and (6) declaratory judgment.

On November 10, 2016, Defendants had not answered Plaintiff's complaint. The court ordered Defendants to answer the complaint by November 29, 2016 and to inform the court regarding the status of the case and their intentions to proceed. *See* ECF No. 7. Defendants answered the complaint on November 29, 2016 and brought two counterclaims against Global for declaratory judgment and breach of contract.

Plaintiff has moved for summary judgment on three of its claims: breach of contract, breach of express warranty, and declaratory judgment.

### III.  LEGAL STANDARD

#### A. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying this standard, courts must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). However, the nonmovant "is entitled to only those inferences that are 'reasonable.'" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014) (quoting *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013)). "[S]ummary judgment cannot rest on purely conclusory statements either in pleading or affidavit form." *Morgan v. Willingham*, 424 F.2d 200, 201 (10th Cir. 1970).

#### B. CONTRACT INTERPRETATION

The interpretation of a contract is a legal question. *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 999 (Utah 2016). This court's task in interpreting a contract "is to ascertain the parties' intent." *Id.* at 1001. "And the best indication of the parties' intent is the ordinary meaning of the contract's terms." *Id.* Therefore, the court first looks to the language of the contract, which it reads as a whole in order to construe various clauses consistently. *See Utah Const. & Dev. Co. v. Reynolds Elec. & Eng'g Co.*, 951 F.2d 1261, at *2 (10th Cir. 1991) (table opinion). "[I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Mind & Motion*, 367 P.3d at 1001 (citation omitted). On

the other hand, "[a] contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.* (citation omitted). When the parties' intentions are not apparent from the face of the contract, the court must also consider extrinsic evidence. *Id.*

## IV. DISCUSSION

### A. BREACH OF CONTRACT

Plaintiff argues that it is entitled to summary judgment on its breach-of-contract claim. Under Utah law, "[t]he elements of a *prima facie* case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

Plaintiff argues that Montclair breached the Agreement in four ways: (1) Montclair used the Test Unit to demonstrate its processes to unaffiliated parties; (2) the Test Unit does not have a functioning vacuum distillation unit; (3) Montclair has not delivered written information and process descriptions of the Test Unit's operation, controls, temperatures, and chemicals needed for Global to operate the Test Unit; and (4) the Test Unit cannot produce fifteen gallons per hour of finished diesel products. The court addresses each of these alleged breaches in turn.

#### 1. Demonstrating the Process to Unaffiliated Parties

First, Plaintiff argues that Montclair used the Test Unit to demonstrate its process to unaffiliated parties. The relevant paragraph from the Agreement reads: "The unit is paid for by Global Recycling SA and upon final payment shall be the sole property of Global Recycling SA. Montclair will not use the unit for its own purposes or to demonstrate its process using the Global test unit to unaffiliated parties." Agreement ¶ 6.

Defendants admit that they used the Test Unit in demonstrations for at least four individuals: Dan Cowart, CEO of Aaron Oil; Keith Bodin, CEO and Owner of Bodin Oil

Recovery; Jim Ennis, CEO of Demenno Kerdoon; and Jim Baccus, CEO of Conexer/Flagship. *See* ECF No. 53-1 at 8. But Defendants argue that they were only restricted from using the Test Unit in demonstrations *after* Global took possession of the Test Unit. ECF No. 47 at 9. However, the language of the Agreement does not support Defendants' position.

The Agreement contains no language indicating that Montclair may use the Test Unit for demonstrative purposes either before or after Global takes possession of it. Instead, the Agreement flatly prohibits Montclair from using the Test Unit for demonstrations to unaffiliated parties and grants no exceptions.

Defendants' position also flies in the face of common sense. Prohibiting Montclair from using the Test Unit in demonstrations only *after* Global has taken possession of the Test Unit and shipped it to a foreign country would be pointless. Once the Test Unit is in Haiti and in Global's control, what chance is there that Montclair would (or could) use it for its own purposes or in demonstrations for unaffiliated parties? The only reasonable interpretation of the Agreement's ownership provision is Plaintiff's: The Agreement prohibits Montclair from using the Test Unit in demonstrations to unaffiliated parties at any time.

In the alternative, Defendants contend that Montclair demonstrated the Test Unit to affiliated parties, as permitted by the Agreement. But in the same breath, Defendants admit that "parties that have seen the Unit saw it for the purpose of establishing an affiliation with Montclair to build a commercial facility in the U.S." *Id.* If parties saw demonstrations in order to establish an affiliation, they were necessarily unaffiliated at the time they witnessed demonstrations.

Finally, Defendants argue that "Global knew Montclair was talking to investors, and telling them about the new technology, and on a few occasion[s] demonstrated the Unit to

6

potential affiliates and partners." *Id.* But Defendants only present evidence that Global knew Montclair was talking to one particular investor, Bodin Oil. Even assuming that Global either consented to demonstrations for Bodin Oil or that Bodin Oil was an "affiliated party" under the Agreement, Defendants still breached the Agreement when they used the Test Unit in demonstrations for at least three other entities.

For the reasons above, the court holds that Montclair breached paragraph six of the Agreement, which prohibited Montclair from demonstrating the Test Unit to unaffiliated parties.

### 2. Vacuum Distillation Unit

Second, Plaintiff argues that the Test Unit does not have a functioning vacuum distillation unit. In May 2017, Defendants admitted "that currently, the Unit does not have a functioning vacuum distillation process."[1] ECF No. 34-3. However, Defendants now maintain that "Montclair is currently working on making those equipment changes to the distillation equipment . . . ." ECF No. 47 at 10.

It appears that time was not of the essence in the Agreement. But the law does not permit Montclair to delay delivery of the bargained-for Test Unit indefinitely. In Utah, "the settled rule is that if a contract fails to specify a time of performance, the law implies that it shall be done within a reasonable time under the circumstances." *Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 858 (Utah 1998).

Here, the parties believed forty-five days would be a reasonable time for performance. That is not a hard-and-fast deadline, but it does give guidance as to a reasonable time for performance. The parties' forty-five-day goal would have seen the Test Unit completed by October 18, 2014. But Defendants admitted as recently as December 7, 2017 that the Test Unit

---

[1] Defendants affirmed at oral argument that the Test Unit still does not have a functioning vacuum distillation process.

7

does not include a functioning vacuum distillation process. Perhaps Defendants could make a reasonable argument that ninety days or one hundred and eighty days is a reasonable timeframe for performance. But three years is more than twenty-five times the parties' original goal and far exceeds a reasonable time for performance.

Defendants also argue that Montclair's failure to include a vacuum distillation process does not constitute a breach because the Agreement does not require the Test Unit to use vacuum distillation. They point to the Agreement's description of the Test Unit, which does not explicitly state that the Test Unit must include a distillation system. But the next paragraph of the Agreement dispels any question regarding the process the Test Unit must use. That paragraph, titled "Process Description," reads, in relevant part: "The process uses elements of sub and supercritical pressures through a high pressure reactor followed by vacuum distillation." The paragraph continues: "The Test Unit process and operating parameters used in the Test Unit will be demonstrated upon the delivery and demonstration of Test Unit as set forth in paragraph 4 hereof."

Defendants counter that the Agreement's reference to vacuum distillation "merely describes what could be done to produce a higher valued product." ECF No. 47 at 11. But their argument finds no support in the Agreement and is contradicted by their own admission that Montclair intended to install a vacuum distillation unit: "Montclair did install equipment designed to be a distillation step, believing they could do it using a simple design and inexpensive equipment and parts they could acquire and . . . fabricate." *Id.* Further, Defendants' argument ignores clear Utah law that courts should "avoid an interpretation rendering any provision meaningless." *Peterson & Simpson v. IHC Health Servs., Inc.*, 217 P.3d 716, 720 (Utah 2009) (internal alterations omitted). Dismissing the Process Description as a mere

suggestion would render much of that paragraph meaningless. Therefore, the court cannot adopt such a reading.

Read in context, the paragraph is unambiguous. It requires that the Test Unit include a distillation step and provides that the process (which includes vacuum distillation) "will be demonstrated upon the delivery and demonstration of the Test Unit . . . ." By Defendants' admission, the Test Unit does not meet that requirement. Montclair failed to perform within a reasonable time, and this constitutes a breach of the Agreement.

### 3. Written Information and Process Descriptions

Plaintiff further alleges that Montclair has not delivered written information and process descriptions of the Unit operation, controls, temperatures, and chemicals needed for Global to operate the Test Unit.

Paragraph four of the Agreement addresses "Demonstration, Acceptance and Delivery of Test Unit." That paragraph indicates that when the Test Unit is complete, "Montclair shall notify Global Recycling SA that it can come to Montclair's facility to see a demonstration of the Test Unit operation and process." The paragraph continues: "In connection with the Test Unit operation, Montclair will deliver written information and process descriptions of the Unit operation, controls, temperatures, and chemicals needed for Global Recycling SA to operate the Test Unit in Haiti."

The plain language of the Agreement establishes that Montclair's duty to deliver written information and process descriptions is not due until the Test Unit is complete. As the court found above, the Test Unit lacks vacuum distillation and is not complete. Therefore, Plaintiff cannot recover for breach of contract on its theory that Montclair has failed to deliver written information and process descriptions. *See* Restatement (Second) of Contracts § 225(1)

("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.").

### 4. Fifteen Gallons Per Hour of Finished Diesel Products

Finally, Plaintiff contends that Montclair is in breach because the Test Unit cannot produce fifteen gallons per hour of finished diesel products as the Agreement's first paragraph requires. That paragraph reads, in relevant part: "Montclair shall build and deliver to Global Recycling SA . . . a working R&D prototype of a continuous batch operating test unit capable of processing a minimum of 15 gallons of a finished diesel product per hour, converted from Used Lubricating Oil (Test Unit)." Agreement ¶ 1.

Defendants claim that a video uploaded to YouTube shows the Test Unit operating at twelve gallons per hour. ECF No. 47 at 13. Defendants allege that the Test Unit also produces fifteen gallons per hour but "the battery on the video camera being used stopped, and therefore the Unit was not recorded at the 15 gph rate." *Id.* Further, Defendant Williams avers that the Test Unit "does process a minimum of 15 gallons of a clean gas oil per hour, converted from used lubrication oil." ECF No. 48 at 3.

Plaintiff counters that the Agreement requires that the Test Unit use vacuum distillation. Consequently, the "finished diesel product" contemplated by the Agreement must have been subjected to vacuum distillation. As the court noted above, there is no functioning vacuum distillation process, so Plaintiff argues that the product the Test Unit currently produces does not fulfill the terms of the Agreement.

The Agreement does not define the term "finished diesel product." Its only other indication as to the nature of the final product is the second paragraph's reference to "a clean gas oil to be distilled into heavy diesel" and a process that will "produce finished fuel products, such as a diesel and by-products produced from typical used motor oil." The court is not persuaded

that it should adopt Plaintiff's reading of the Agreement and pronounce that the Test Unit does not produce a "finished diesel product" solely because the Test Unit does not use vacuum distillation. Consequently, there is a genuine dispute as to whether the Test Unit produces fifteen gallons per hour of a "finished diesel product."

### B. BREACH OF EXPRESS WARRANTY

Plaintiff also argues that it is entitled to summary judgment on its breach of express warranty claim. In Utah, a seller creates an express warranty by:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Utah Code Ann. § 70A-2-313(1)(a), (b). To recover under a theory of breach of express warranty, Plaintiff must prove all of the following: (1) that Defendants made an express warranty that became part of the basis of the parties' bargain; (2) that the Test Unit did not conform to this warranty; (3) that Plaintiff was harmed; (4) that the failure of the Test Unit to conform to the warranty was a cause of Plaintiff's harm; and (5) that Plaintiff could have reasonably been expected to use or be affected by the product. MUJI 2d CV1028 (Breach of Express Warranty). In Utah, "a cause of action for breach of express warranty sounds in strict liability." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs.*, 28 P.3d 669, 676 (Utah 2001) (citation omitted). "Therefore, a 'person may be liable for breach of warranty despite his exercise of all reasonable or even all possible care.'" *Id.* (citations omitted).

In the Agreement, Montclair described the Test Unit to be sold as "capable of processing a minimum of 15 gallons of a finished diesel product per hour" using "elements of sub and supercritical pressures through a high pressure reactor followed by vacuum distillation." Montclair guaranteed "the price and operation of the unit." And Mr. Williams "as an individual,

11

apart from his ownership in Montclair Technology LLC, . . . personally guarantee[d] the final construction costs of the unit." Mr. Williams also guaranteed that, "[i]n the event the unit costs more than $60,000 US dollars [sic] Williams will make up the difference to insure Global will take ownership of the finished unit free and clear of any financial encumbrances." These guarantees, which were included in the Agreement and which formed the basis of the bargain at issue, constitute express warranties. And it is undisputed that the parties expected Plaintiff to use the Test Unit. Consequently, Plaintiff has proven the first and fifth elements of a breach-of-warranty claim.

The questions remaining are whether Defendants breached express warranties and whether such a breach is the direct and proximate cause of damage to Plaintiff. Plaintiff alleges two specific breaches: (1) the Test Unit does not meet the Agreement's price guarantees, and (2) the Test Unit does not meet the Agreement's operational guarantees.

Whether the Test Unit conforms to the Agreement's price guarantees is a disputed question of fact that cannot be resolved on a motion for summary judgment. The parties agree that Plaintiff paid Montclair more than the $60,000 required by the Agreement. However, the parties disagree on whether the excess payments went to the purchase price or to "upgrades" to the Test Unit not contemplated in the Agreement.

However, it is undisputable that the Test Unit does not conform to the Agreement's operational guarantees. Plaintiff made complete and timely payment. But, as the court discussed above, Montclair breached the Agreement because the Test Unit does not include a functioning vacuum distillation process. Consequently, Plaintiff has not received a Test Unit that operates as Montclair guaranteed. Therefore, Plaintiff has proven the second, third, and fourth elements of its breach-of-warranty claim, and it is entitled to summary judgment thereon.

**C. DECLARATORY JUDGMENT**

Finally, Plaintiff asks the court for a declaratory judgment (1) that Global "is the sole and exclusive owner of the technology developed by Montclair to convert lubricants to diesel," (2) that Montclair "cannot sell or market this process and technology to third parties or use it for its own purposes because it is owned by Global," and (3) that "Montclair cannot disclose any trade secrets of Global, including the technology and processes described in Global's agreement with Montclair." ECF No. 2 at 12. Plaintiff's claim to ownership of the technology is based solely on a four-word phrase found in paragraph two of the Agreement: "This process is known as 'Hydrothermal Upgrading' using proprietary know how [sic], equipment, and methods developed by Montclair and is <u>confidential and personal to</u> Global Recycling SA." (emphasis added).

Plaintiff argues that the words "confidential and personal to" transfer ownership of Montclair's proprietary knowhow and methods. Citing definitions in Louisiana and Virginia case law, as well as in Black's Law Dictionary, Oxford English Dictionary, Merriam-Webster Dictionary, and Cambridge Dictionary, Plaintiff argues that "it is generally accepted that 'personal' or 'personal to' denotes ownership." ECF No. 34 at 10. Consequently, the Agreement's provision that the Test Unit's process is "personal and confidential to Global" effectuated a transfer of Montclair's "proprietary know how [sic], equipment, and methods" used in the Test Unit to Global. As Plaintiff would have the court read the Agreement, these four words buried in the Agreement's "Process Description" transfer to Global ownership not just of the Test Unit, but of the unit's entire process, for a mere $60,000.

Defendants read the same language differently. Defendants argue that, rather than conferring ownership of proprietary processes and knowhow, the phrase in question requires that Montclair's proprietary processes be kept confidential and used personally by Global. In other

words, while Global would be permitted to use the processes and technologies contained in the R&D Test Unit to build on a larger scale, it would be required to keep those proprietary secrets confidential and would not sell them to third parties.

The court finds Plaintiff's position untenable and at odds with the other terms of the Agreement. First, the words "personal" and "confidential" do not transfer ownership by themselves. Neither do those words always serve to denote ownership. The primary definition of "personal" in Black's Law Dictionary is "of or affecting a person." *Personal*, Black's Law Dictionary (10th ed. 2014). And the primary definition of "confidential" is "meant to be kept secret; imparted in confidence." *Confidential*, Black's Law Dictionary (10th ed. 2014). The phrase "confidential and personal to Global" could easily mean "affects Global and is imparted in confidence."

Second, Plaintiff can point to no other provision of the Agreement that even hints that Montclair agreed to sell its process. The title of the Agreement is "Purchase Order Agreement (Invoice)." Paragraph three of the Agreement indicates that the purchase price of $60,000 is "for a complete mechanically skidded fully operational Test Unit." And paragraph six provides that the Test Unit—not any proprietary technology or process—shall be the sole property of Global. Reading the contract as a whole, the Agreement is for the purchase of a Test Unit—not the purchase of the unit's underlying technology and processes.

Even if the Agreement were ambiguous as to whether Montclair was selling the underlying process, other evidence in the record is inconsistent with such a conclusion. In an email from Michael Williams to Peter de Gier on May 9, 2014, Williams indicates that "[t]he only way [he] would do this business with [de Gier] is to convert [Williams'] technology and experience into some ownership percentage of the plant in Haiti. [He was] not selling technology

and [was] not doing this for practice." ECF No. 49 at 35. Furthermore, Plaintiff relies on a declaration by Peter de Gier for the proposition that "Montclair informed Global that it intended to sell the technology in the Unit." ECF No. 35 at 2. But de Gier's declaration indicates that this occurred in August 2016—years after the parties entered into the Agreement. Montclair may well have indicated that it wished to sell its technology, but such an indication in 2016 does not support Plaintiff's interpretation of the 2014 contract.

But the Agreement is not ambiguous. Read as a whole, it is a contract for sale of a Test Unit—not for sale of proprietary technology and processes. Therefore, Plaintiff is not entitled to summary judgement on its claim for a declaratory judgment.

## V. CONCLUSION

For the reasons above, the court DENIES Plaintiff's motion for partial summary judgment with regard to the declaratory judgment. However, it GRANTS Plaintiff's motion for partial summary judgment with regard to breach of contract and breach of express warranty. Specifically, the court holds:

1. Montclair breached the Agreement by demonstrating the Test Unit to unaffiliated parties;

2. Montclair breached the Agreement by not producing a Test Unit with a functioning vacuum distillation unit within a reasonable time; and

3. Montclair breached its express warranty regarding the Test Unit's operation because the unit did not include a functioning vacuum distillation unit within a reasonable time.

Signed December 18, 2017

        BY THE COURT

        _____
        Jill N. Parrish
        United States District Court Judge